IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 18, 2020

**STATE OF TENNESSEE v. TANDY TOMLIN**

**Appeal from the Circuit Court for Rutherford County**
**No. F-78021  Royce Taylor, Judge**

_____

**No. M2019-00274-CCA-R3-CD**

_____

The Appellant, Tandy Tomlin, was convicted by a Rutherford County Circuit Court Jury of eight counts of rape of a child, two counts of aggravated sexual battery, one count of solicitation to commit rape of a child, and one count of solicitation to commit aggravated sexual battery. The trial court merged two of the rape of a child convictions and sentenced the Appellant to consecutive sentences of thirty years for each rape of a child conviction, ten years for each aggravated sexual battery conviction, ten years for the solicitation of rape of a child conviction, and five years for the solicitation of aggravated sexual battery conviction, for a total effective sentence of 245 years. On appeal, the Appellant contends that the evidence was insufficient to sustain his convictions, that the trial court erred in sentencing, and that his right to a fair trial was violated when he was escorted into the courtroom through a security door by a uniformed officer in view of the jury pool. Upon review, we conclude that the State adduced insufficient evidence to sustain the Appellant's conviction of rape of a child in count 7 and reduce the conviction to aggravated sexual battery with an accompanying sentence of ten years to be served consecutively to the remaining sentences. The trial court's judgments are affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Michael Auffinger, Murfreesboro, Tennessee, for the Appellant, Tandy Tomlin.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Jennings H. Jones, District Attorney General; and Hugh Ammerman, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION

## I. Factual Background

On August 9, 2017, the Appellant was charged with nine counts of rape of a child, one count of aggravated sexual battery, one count of solicitation of rape of a child, and one count of solicitation of aggravated sexual battery. The victim, who was twelve years old at the time of the offenses, was the daughter of the Appellant's first cousin.

At trial, the victim testified that her date of birth was July 6, 2000. The victim said that in the fall of 2012 and early 2013, she was living with her father; her father's girlfriend, whom the victim referred to as her "stepmother" (hereinafter "stepmother"); her two brothers; her stepmother's two sons (hereinafter "stepbrothers"); and the Appellant in a three-bedroom mobile home in the area of Barfield Road and Veterans Parkway in Murfreesboro. Initially, the victim's parents shared the master bedroom; her brothers shared the second bedroom; her stepbrothers shared the third bedroom, which had bunk beds; the victim slept on the couch in the living room; and the Appellant slept on the living room floor. Later, the stepmother went to jail, and her mother (hereinafter "stepgrandmother") moved into the mobile home to take care of the stepmother's sons. Thereafter, the victim, her stepgrandmother, and one of her stepbrothers shared the bedroom with bunk beds. The other brothers shared the third bedroom. The victim's father remained in the master bedroom, and the Appellant slept in the living room.

The victim said that the household was "chaotic," but the Appellant "was nice to everybody." The victim was close to her stepmother but did not get along well with her stepgrandmother. While the Appellant lived there, he worked during the day and got home around 4:30 or 5:00 p.m. The victim said that her father was a painter, that he owned his own company, and that he was often gone on weekends. The Appellant was "kind of in charge" when the victim's father was gone, and the victim had more interaction with the Appellant than with her stepgrandmother.

The victim said that the Appellant gave her a cell phone but later took it away from her. The Appellant bought skates for the victim and one of her brothers. The victim's skates were "custom made," but her brother's skates were "basic." The Appellant also bought the victim a hoodie and some other clothes; however, other than the skates, he did not buy gifts for her brothers. For Halloween, the Appellant bought the victim "a black and white one piece kind of like a lingerie Halloween [cat] costume," and he took the victim and some friends to a haunted house. The victim did not wear the cat costume because her stepgrandmother had found it and thrown it away.

The victim said that the Appellant sometimes took the cell phone away from her. One morning, she awoke and discovered that the Appellant had ripped the hoodie and thrown it on her bed. The Appellant told her that he had ripped the hoodie because she had the telephone number of a boy her age.

The victim said that the Appellant had a red four-door sedan with cloth interior and that he drove the victim to the store to get "Flaming Hot Cheetos" or sunflower seeds, to the park, and "to dead ends" of roads. When the stepmother was living at home, she ensured that the Appellant also took the victim's brothers when they went somewhere in his car. After the stepmother went to jail, the Appellant drove the victim places alone.

The victim said that normally she was not allowed to go anywhere and that she was not allowed to have anyone visit the mobile home. After her stepmother went to jail, the Appellant allowed her to go to different places and to have her friends visit when her father was at work. The victim also "did stuff that [the Appellant] asked [her] to do." If the victim refused any of the Appellant's requests, he threatened to tell her father that the victim had friends come over.

The victim said that the first time the Appellant touched her inappropriately, they were outside the mobile home, it was dark, "everybody" was playing hide and seek, and the Appellant was "it." The victim was hiding in a bush when the Appellant came up to her, slipped his hand inside the waistband of her yoga pants, touched her vagina, and moved his hand around.

The victim said that the first time the Appellant put his penis inside her vagina, they were in the living room of the mobile home. The victim said that she and the Appellant were home alone during the daytime and that they were sitting on the couch watching television. The Appellant started touching her and told her, "[Y]ou will be rewarded for this later." The victim lay on her back on the couch, and the Appellant lay on top of her. The victim's shirt was on, and her pants and panties were around her ankles. The Appellant's shirt was on, and his pants and boxers were around his ankles. The Appellant penetrated her vagina with his hands then penetrated her vagina with his penis. The victim said that "[i]t hurt." One of the victim's brothers came home and discovered that the front door, which led directly into the living room, was locked. Her brother knocked on the door. The victim told the Appellant to stop, and the Appellant stopped. When the Appellant opened the door, and her brother asked why he did not open the door earlier. The Appellant said, "[B]ecause I was just playing around with you."

The victim said that her stepmother was not in jail at the time of the first two offenses, but she was in jail when later offenses occurred away from the mobile home. The victim recalled that on one occasion around 6:00 or 7:00 p.m. when it was almost dark

outside, the Appellant drove the victim to Barfield Park. He parked the car and then reached toward the victim, who was sitting in the front passenger seat. The Appellant stuck his hands inside her jeans and put his fingers inside her vagina. The victim said that Barfield Park was a big park with several parking lots, a baseball field, and "stands that [have] – tables and stuff up under them where you can have like birthday parties and stuff." The victim had gone to the park on other occasions, and the Appellant let her drive his car around in circles. The Appellant did not let anyone else drive his car.

The victim recalled that Lawrence Street was located a short drive from her house. On two separate occasions when it was dark outside, the Appellant drove the victim to the dead end of Lawrence Street and parked the car. He asked the victim to get into the back seat, she complied, and the Appellant then penetrated her vagina with his penis. The victim never saw anyone else at Lawrence Street. Each time, the Appellant and the victim stayed at Lawrence Street for thirty or thirty-five minutes.

The victim said that on multiple occasions, the Appellant took her to the dead end of Suzanne Street. On one occasion, the Appellant "touched [her] with his fingers," and he penetrated her vagina with his penis. On another occasion, he penetrated her vagina with his penis. The third time, "he touched [her] with his fingers." He asked her to perform oral sex on him, but she refused.

The victim said that the last time the Appellant touched her inappropriately was approximately a week to three weeks before her stepmother was released from jail. The Appellant tried to touch the victim again after her stepmother was released, but she told him no. The victim said that she had told him no on other occasions, and the Appellant "would take [her] stuff." The victim stated that she usually got along with the Appellant but that there was "tension" between them when she "would tell him no and he would take [her] stuff." The victim said that she would get angry and would hit the Appellant. The victim explained that she hit the Appellant "[b]ecause I was tired of him touching me. And if I wouldn't let him touch me, then he would take my stuff. He would rip my clothes up and break my phone. He wouldn't let me drive and everything."

The victim said that on one occasion, she was sending text messages to a boy from school. The Appellant saw the text messages and told her to give him the cell phone. The victim refused and ran out the door into the street. When the Appellant ran after her, she threw the telephone onto the concrete, and the telephone "busted."

The victim said that after the last time the Appellant touched her inappropriately, he asked if she wanted him to drive her to the store to get Cheetos and sunflower seeds. The victim said no. The Appellant responded, "[O]kay, well, I'm about to take everything back that I got you." The victim replied, "I don't care. I don't want you to touch me anymore."

The victim's reply made the Appellant angry, and he said that she would regret her decision.

The victim said that the Appellant never wore a condom. She recalled that "[h]e would lick his hand and touch his penis" before touching her with his penis. The victim said that she had seen semen come out of the Appellant's penis and that sometimes it went onto his car seats and once went onto the victim's pajama pants. The victim said that on one occasion when they were at the dead end of Lawrence Street, the Appellant "asked me if I could jack him off," meaning to touch his penis with her hands until he ejaculated. The victim refused.

The victim remembered that on one occasion before her stepmother went to jail, the Appellant was sitting on the couch, and the victim was "straddl[ing]" his legs and "play wrestling" with him. Her stepmother came into the living room and made the victim go into another room with her. She told the victim, "[I]t's not appropriate for a young lady to be sitting on him like that. I don't ever want to see you sit on a man like that again." The victim recalled that her stepgrandmother "walked into the bedroom when [the victim and the Appellant] were play fighting one time. And [the Appellant] had [the victim] like kind of bend over on the bed with his hands on [her] breasts."

The victim said that while her stepmother was in jail, her stepmother discovered that the victim had hit the Appellant. Her stepmother called the victim and asked "what was going on between" the victim and the Appellant. The victim, knowing her stepmother would be coming home soon, told her stepmother they would talk when she got home. The victim also told her stepmother that she wanted the Appellant in jail.

The victim said that after her stepmother returned home from jail, she noticed that the victim was acting differently. Her stepmother asked the victim what she wanted to say about the Appellant. The victim told her stepmother everything the Appellant had done. The victim was in her parents' bedroom when her stepmother told the victim's father what the Appellant had done. The victim's father was angry and wanted to hurt the Appellant. The stepmother prevented the victim's father from leaving and closed the bedroom door. The victim slept in her parents' bedroom that night.

The victim said that the next morning, her father went into the living room, sat on the couch beside the Appellant, and asked if the Appellant had touched the victim inappropriately. The Appellant responded, "[N]o, she's lying. I would never do that, Cuz." The victim's father told the Appellant that the victim would not "lie about something like that. And the details that she has told us, there is no way she knew about unless it actually happened." The victim's father told the Appellant to leave, they would pack the Appellant's belongings and put them in his car, and he should not come around the family.

The victim recalled that the Appellant kept his belongings in the living room inside three or four "little rolly, tall tote things that had drawers in them." As the victim and her parents packed the Appellant's belongings, they found several things belonging to the victim, such as her panties and "little knickknack stuff."

The victim said that after she told her parents about the Appellant, she told her "sister," Vanessa.[1] Vanessa's grandmother, Elizabeth Baggett, told the victim that Vanessa had told her about the incidents. Baggett said the victim could talk with her, but the victim responded that she did not want to talk.

The victim said she told everyone that she did not want the police to be contacted. However, in October 2013, approximately nine or ten months after the last offense, she gave a statement at the Child Advocacy Center (CAC). The victim acknowledged that she was almost eighteen years old at the time of trial and was more "sophisticated" than she was at the time of the offenses. The victim explained that when the Appellant first put his hand inside her pants, she "didn't know what to think. I knew it wasn't normal. But I didn't know if I should tell anybody or not." The victim feared that if she told her father or stepgrandmother, her father would do something and be sent to jail. At the time, her stepmother was in jail, and the victim did not want to be without both of her parents.

The victim said:

> I dreaded doing [sexual acts with the Appellant]. But a lot of my friends that I went to school with were rich. And my dad was poor. And I didn't really have anything. So, having a cell phone at that time was like a big deal in school. And going skating, like getting your own – having your own pair of skates was big deal.
>
> And, basically, everything that he had bought me was a big deal to me because I had never had it, never had a chance to get it.

On cross-examination, the victim said that the mobile home was a "single wide." The victim stated that the park closed at dark and that the gate was closed. She clarified that the Barfield Park offense occurred "about sun down." She estimated that she and the Appellant stayed at the park for approximately fifteen or twenty minutes. When she and

---

[1] Because two individuals in the case have the same surname, we will refer to them by their first name. No disrespect is meant to these individuals.

- 6 -

the Appellant went to the park, he told "anyone home" that they were going to the park. The victim said that it was not common for them "to go hang out at the park." They went to the park only two other times, and on those occasions, the Appellant took one of the brothers with them.

Regarding the incidents at the dead end of Lawrence Street, the victim said that before she and the Appellant left, the Appellant told the people who were at home that he and the victim were going to her friend Nina's house. The Appellant and the victim were gone for approximately thirty minutes. On another occasion, the Appellant took the victim to the dead end of Suzette Street after they "dropped [her] friend Nina off." The victim said the offenses usually happened during the week.

On redirect examination, the victim said that it was not completely dark when the Appellant took her to Barfield Park. However, during the game of hide and seek and when the offenses on the dead end streets occurred, it was completely dark. The victim explained that Nina came over during the week to help the victim with her homework. The victim's father was at work when the Appellant took the victim to Barfield Park, Lawrence Street, and Suzanne Street. The victim said that her father routinely worked late in the evening; however, when he was at home and asked why the victim was leaving the house, the victim and the Appellant said that they were taking Nina home. The victim said that after they left Nina's house, the Appellant usually took the victim to one of the dead end streets. The Appellant let the victim know what he wanted "[w]hen he parked the car and said that we were going to do something." He promised to reward her for it later.

The stepgrandmother testified that the last week of September or the first week of October 2012, she moved into her daughter's mobile home to take care of the children while her daughter was incarcerated. The stepgrandmother said that the father was the stepmother's "long time" boyfriend. The stepgrandmother was "kind of like grandma" to the victim and her brothers, but the stepgrandmother did not "think they accepted" her. She explained, "They more or less let me know that I had no responsibility towards them. And they didn't have to answer to me."

The stepgrandmother said the mobile home had two bedrooms. The master bedroom and master bathroom were on one end of the home, and the second bedroom was on the other end. A second bathroom was "down the hallway." The home had a kitchen and a living room, which was used as a third bedroom. While the stepmother was in jail, the father and his two sons slept in the master bedroom, and the victim, the stepgrandmother, and one of the stepbrothers slept in the other bedroom. A stepbrother and the Appellant slept on the two sofas in the living room. The stepgrandmother stated that the Appellant was the father's first cousin and that the Appellant was living in the

mobile home to babysit the children when the father was not at home. The stepgrandmother thought the Appellant paid rent to the victim's father.

The stepgrandmother said that she was not concerned with how the Appellant, who she thought was in his 30's, interacted with the boys but that she was concerned with how he interacted with the victim. She said, "I knew the relationship was not right. It was not . . . a grown male relative towards a child, a female child. It was different." The stepgrandmother said that initially, she thought the relationship between the Appellant and the victim was a "little deeper really than friends." The Appellant and the victim chased each other through the house with squirt bottles full of water and sometimes wrestled on the beds.

The stepgrandmother described another incident:

> [The stepgrandmother:] There was one day in particular when I followed them into our bedroom, mine and [the victim's] bedroom. And I saw [the victim] -- they were standing. And [the victim] was bent over and [the Appellant] was bent over her back leaning into her with his hands folded across her breasts with his hands. And she had her hands crossed over his arms.
>
> [The State:] And, so, where were his hands in relation to her breasts?
>
> [The stepgrandmother:] Cupped right over the breasts.
>
> [The State:] And where was his -- where was his genitalia in relation to her genitalia?
>
> [The stepgrandmother:] Well, he was like bent over her body. Her body was so much smaller and shorter than his. He was just bent over like hugging her. Like he was hugging her.
>
> [The State:] And you saw this. And what did you do?
>
> [The stepgrandmother:] When I walked in and saw it, my first instinct was, I told them, get your hands off of that child's breasts. And they both jumped up. Just stepped aside from each other. And [the victim] said, he wasn't touching my breasts.

The stepgrandmother said that the Appellant was often alone in the car with the victim. The stepgrandmother explained that the Appellant would ask the victim to go to the store with him. If the stepgrandmother or the boys asked to go, the Appellant would say that he did not have enough room in his car for any of them. The stepgrandmother acknowledged that the Appellant's car was small and that he had a lot of "junk" in it. However, she thought at least two or three additional people could have fit in the car.

The stepgrandmother said that sometimes the victim's friends came to visit on the weekends. The Appellant would pick up the victim's friends, and he would take the victim with him when he took her friends home. Afterward, "it took them quite a long time to take all of the kids home and get back." The stepgrandmother thought the Appellant's behavior was suspicious.

The stepgrandmother said that the victim's father was "never around" and that he told her the victim was to have "no kids at the trailer." However, the Appellant told the stepgrandmother that the father had given him permission to allow the friends to visit. Later, the stepgrandmother confronted the father about the situation. The father "didn't say yay or nay. All he said was [the Appellant] shouldn't have told you that."

The stepgrandmother said that she was concerned about the gifts the Appellant bought for the victim. She noted that for "Halloween he bought her this silky, black, sexy outfit like for a bad girl with satin hose with the garter belt and the short shorts, and the short silky top." The stepgrandmother "got rid" of the outfit and told the father about it. The stepgrandmother told the Appellant that the outfit was not appropriate for the twelve-year-old victim. The Appellant did not respond.

The stepgrandmother recalled that at Christmas, the Appellant bought the victim a ten-speed bicycle, but he did not buy presents for the other children. When the stepgrandmother asked the Appellant about it, he said that he ran out of money. The Appellant also bought the victim a pair of skates, which the stepgrandmother did not understand because there was no place where the victim could skate unless the Appellant took her to a skating rink.

The stepgrandmother said that one night she was alone with the Appellant, and he was sitting "with his head hanging down[, and h]e was remorseful." The Appellant seemed guilty and was almost crying. He told the stepgrandmother "that he had an inappropriate relationship with someone. And he knew it was wrong. But he couldn't help it." The Appellant said that he thought about the person when he was going to sleep, when he was waking up, and all day long at work. The Appellant denied that he was referring to the victim and said that the victim was "dirty" and "stunk." The stepgrandmother said that

sometime after that conversation, the Appellant showed her a woman's photograph on his cell phone, and he told the stepgrandmother the woman was his girlfriend. The stepgrandmother never saw the woman in the photograph "in real life," and she never saw the Appellant have regular interaction with other adults.

The stepgrandmother said that she asked the victim about her relationship with the Appellant, but the victim denied anything inappropriate. The stepgrandmother tried to be someone with whom the victim could "open up" but surmised that the victim "didn't want a relationship with me. And she would fight me." The stepgrandmother said she got along better with the Appellant than she did with the victim, that she "really liked" the Appellant, and that she had no reason to lie about the Appellant.

The stepgrandmother said that she raised her concerns with the victim's father, who responded, "[N]ot my cuz. My cuz wouldn't do that to me. My cuz wouldn't do that to my daughter." The stepgrandmother told the school counselor of her concerns, but Appellant and the victim denied that anything was happening.

The stepgrandmother said that the Appellant moved out of the mobile home soon after the stepmother returned home. Later, the stepgrandmother learned that the victim had told the stepmother what the Appellant had done to her. The stepmother informed the father, and they made the Appellant leave. The stepgrandmother did not know the Appellant had left until she saw that his belongings were not in the living room.

Elizabeth Baggett testified that her daughter, Lucinda, had dated the victim's father approximately thirty years ago and that he had fathered two of her children. At the time, Lucinda had two other children, one of whom was Vanessa, and the children thought of the victim's father as a "father figure." After the Appellant's relationship with Lucinda ended, the victim's father had children of his own, including the victim. Although Vanessa and the victim were different ages, "[t]hey were like sisters." The victim referred to Baggett as "Mamaw."

Baggett said that she had never met the Appellant but that Vanessa told her about some things that happened between the Appellant and the victim. Baggett learned from Vanessa that the police had not been informed, and Baggett called the Department of Children's Services (DCS).

Kevin Smith testified that in September 2013, he was a Child Protective Services (CPS) investigator. On September 12, 2013, Investigator Smith received a report regarding the victim. Investigator Smith first spoke with the person who made the report, and then he spoke with Vanessa. Later that day, Investigator Smith contacted the victim's father, who put Investigator Smith in touch with the victim. The victim gave Investigator Smith

"[v]ery detailed, concerning information," including a name and description of the perpetrator.

Investigator Smith said that approximately one month later, the victim went to the CAC where she was interviewed by a forensic investigator. Investigator Smith said that the interview was conducted in a room that looked like a child's bedroom. Inside the room was "a closed circuit alarm clock which allows us who are sitting in another room to observe and to also provide feedback if necessary for additional questions that we desire." Investigator Smith observed the victim's interview. The information the victim gave during the interview was consistent with the information she had given Investigator Smith. He did not recall if the victim gave any additional details during her forensic interview.

Investigator Smith said that law enforcement became involved in the case in September and that the last sexual contact between the Appellant and the victim was "on or about approximately New Years." Investigator Smith stated that a delayed disclosure was not unusual for a victim in a sexual abuse case. However, given the delay, physical evidence likely would have been lost, and any injuries would have been healed.

On cross-examination, Investigator Smith said that "the allegation – in layman's terms – it was substantiated as having occurred." A determination was made that the victim was no longer in danger because her parents "were protective" and were preventing any contact between her and the Appellant.

The stepmother testified that her "significant other" was the victim's father and that she considered the victim to be her stepdaughter. The stepmother said that she and the victim "g[o]t along" and that their relationship was "[v]ery strong."

The stepmother acknowledged that she had prior convictions of attempted aggravated burglary, conspiracy to commit aggravated robbery, sale or delivery of a schedule III controlled substance, and misdemeanor theft. The stepmother said that she was arrested on September 10, 2012, and was in custody on the robbery charge while most of the instant offenses occurred. She was released on January 22, 2013.

The stepmother said that the Appellant moved into the mobile home approximately five months before she went to jail. The mobile home had two bedrooms, and people routinely slept in the living room. The stepmother said that everyone in the home got along with the Appellant "for the most part." The stepmother saw one incident between the victim and the Appellant that concerned her. Specifically, she recalled seeing the victim straddling the Appellant's lap while the victim was "trying to crack the code" on the Appellant's cell phone. The stepmother made the victim go into the bedroom with her then told the victim, "I don't ever want to see you sitting on any kind of man like that ever

- 11 -

again."  The victim returned to the living room, sat on the edge of the couch, and continued to play with the Appellant's cell phone.

The stepmother said that when she went to jail, the stepgrandmother moved into the mobile home to help the father with the children.  Approximately three or four days after the stepmother returned home from jail, the Appellant "made a statement that he was in love with a younger girl and she was perfect.  And no one could amount to her.  And she was too young and he couldn't ever say her name."  The stepmother asked if the victim was the girl.  The Appellant "paused and hesitated for a minute" and then he said the girl was not the victim.  However, the Appellant would not tell the stepmother a name.

The stepmother said that she never saw the Appellant have much of a social life. She explained that he was either at home, at work, or at "the skating rink with the other kids."  The stepmother recalled that the Appellant kept "Flaming Hot Cheetos and sunflower seeds underneath his table" and that he "taunt[ed]" the victim with the items "to make her want" them.  The stepmother explained that a coffee table "was next to the couch where [the Appellant] slept and where he kept his things. . . .  It was a plastic tote with three drawers in it."

The stepmother said that approximately five days after she came home from jail, the victim "was acting weird."  The stepmother took the victim into the stepmother's bathroom and asked if the victim was having sex.  The victim said that she was not having sex "at that time."  The stepmother asked if the victim had ever had sex, and the victim responded yes.  The stepmother asked with whom, and the victim eventually revealed it was with the Appellant.  The victim then told her stepmother what the Appellant had done to her.  The stepmother found the victim's story especially believable when "[s]he said that he licked his hand and put it on the head of his penis."  After speaking with the victim for about twenty minutes, the stepmother asked the father to join them in the master bedroom.

After the father came into the room, the stepmother told him what the victim had told her about the Appellant.  The father stopped listening, grabbed a baseball bat, and tried to leave the bedroom.  The stepmother prevented him from leaving, and eventually, the father calmed down.

The stepmother said that she and the father made the victim sleep in their bedroom that night.  The Appellant stayed in the living room.  The next morning, the father went into the living room, sat beside the Appellant, and said, "[Y]ou know what you did."  The Appellant "started crying and said I didn't do that, cuz.  I didn't do that, cuz."  The father told the Appellant, "[Y]our stuff will be in your car.  Don't come back to this house."

The stepmother said that when she, the victim, and the victim's brothers were packing the Appellant's belongings, they found the victim's "panties, shorts, hair brushes, and some other odd and end stuff . . . in his drawers in the plastic tote."

The stepmother said that the police were not immediately contacted because the victim "just wanted to get it out of her mind. She didn't want to keep bringing it up." The victim was having problems in school, and she did not want to talk about what had happened to her.

The Appellant elected not to testify or put on proof. The jury found the Appellant guilty of rape of a child, a Class A felony, as alleged in counts one through eight; guilty of aggravated sexual battery, a Class B felony on counts nine and ten; guilty of solicitation to commit rape of a child, a Class C felony on count eleven; and guilty of solicitation to commit aggravated sexual battery, a Class D felony on count twelve.

At the sentencing hearing, the trial court merged counts four and five. The trial court sentenced the Appellant to thirty years for each rape of a child conviction, ten years for each aggravated sexual battery conviction, ten years for the solicitation of rape of a child conviction, and five years for the solicitation of aggravated sexual battery conviction. The trial court ordered all of the sentences to be served consecutively for a total effective sentence of 245 years.

On appeal, the Appellant contends that the evidence was insufficient to sustain his convictions, that the trial court erred in sentencing, and that his right to a fair trial was violated when the Appellant was escorted into the courtroom "in full view of the entire jury pool th[r]ough a locked security door under escort by uniformed law enforcement."

## II. Analysis

A. Sufficiency of the Evidence

On appeal, a jury conviction removes the presumption of the Appellant's innocence and replaces it with one of guilt, so that the Appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The Appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the

credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

As charged in this case, rape of a child is the unlawful sexual penetration of a victim by a defendant if the victim is more than three years old but less than thirteen years old. Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7). Aggravated sexual battery in this case is "unlawful sexual contact with a victim by the defendant," and the victim is less than thirteen years old. Tenn. Code Ann. § 39-13-504(a)(4). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6). Tennessee Code Annotated section 39-12-102 provides:

> (a) Whoever, by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense, or attempts to command, request or hire another to commit a criminal offense, with the intent that the criminal offense be committed, is guilty of the offense of solicitation.

> (b) It is no defense that the solicitation was unsuccessful and the offense solicited was not committed. It is no defense that the person solicited could not be guilty of the offense solicited, due to insanity, minority, or other lack of criminal responsibility or incapacity. It is no defense that the person solicited was unaware of the criminal nature of the conduct solicited. It is no defense that the person solicited is unable to commit the offense solicited because of the lack of capacity, status, or characteristic needed to commit the offense solicited,

- 14 -

so long as the person soliciting or the person solicited believes that either or both have such capacity, status, or characteristic.

On count one, rape of a child, the State elected the "digital penetration of the victim by the [Appellant] on the couch in the living room." On count two, rape of a child, the State elected the "penile, genital penetration of the victim by the [Appellant] on the couch in the living room." Regarding those counts, the victim testified that she and the Appellant were the only ones at home. They were sitting on the couch in the living room when the Appellant started touching her, and he promised that she would "be rewarded for this later." The victim lay on her back on the couch with her shirt on and her pants and underwear down. The Appellant lay on top of the victim with his shirt on and his pants and underwear down. The Appellant penetrated her vagina with his hands, which was sufficient to sustain his conviction in count one. Regarding count two, the victim testified that the Appellant penetrated her vagina with his penis, which was sufficient to sustain his conviction of rape of a child.

On count three, rape of a child, the State elected the "digital genital penetration of the victim by the [Appellant] while parked at Barfield Park in the [Appellant's] car when it was almost dark outside." The victim testified that on one occasion around 6:00 or 7:00 p.m. when it was almost dark outside, the Appellant drove her to Barfield Park, parked his car, stuck his hands into the victim's jeans, and put his fingers inside her vagina. The victim's testimony is sufficient to sustain the conviction in count three.

Count four charged the Appellant with rape of a child, and the State elected "the first of just two separate incidents of penile, genital penetration of the victim by the [Appellant] in his car parked at the dead end of Lawrence, which was the first time the [Appellant] had ever taken the victim to park at a dead end." Count five charged the Appellant with rape of a child, and the State elected the "second of these two separate incidents penile, genital penetration of the victim by the [Appellant] in his car parked at the dead end of Lawrence." The victim testified that on two separate occasions, the Appellant drove her to the dead end of Lawrence Street. He parked, had the victim get into the backseat of his car, and then he penetrated her vagina with his penis. The evidence is sufficient to sustain the conviction in counts four and five.

On count six, rape of a child, the State elected the "penile, genital penetration of the victim by the [Appellant] in his car parked at the dead end of Suzanne." On count seven, rape of a child, the State elected the "digital genital penetration of the victim by the [Appellant] in his car parked at the dead end of Suzanne, which occurred during the same occasion as penile, genital penetration described above in Count 6." Count eight charged the Appellant with rape of a child, and the State elected "an occasion separate from that described in Counts 6 and 7 above wherein penile, genital was the only form of penetration

- 15 -

of the victim by the [Appellant] in his car parked at the dead end of Suzanne." The victim testified that the Appellant drove her to the dead end of Suzanne Street. On one occasion on Suzanne Street, the Appellant "touched [her] with his fingers," and he penetrated her vagina with his penis. On another occasion, he penetrated her vagina with his penis. The third time, "he touched [her] with his fingers." He asked her to perform oral sex on him, but she refused. The victim testified that offenses on Lawrence Street and Suzanne Street occurred after she and the Appellant had taken the victim's friends home. The stepgrandmother's testimony confirmed that on the occasions when the Appellant and the victim drove the victim's friends home, they were gone for a long time. The evidence is sufficient to sustain the convictions in counts six and eight. However, as to count 7, the victim testified that "he touched me with his fingers." She made no allegations of penetration. Accordingly, we must reverse his conviction of rape of a child in count 7. Regardless, we note that while the State was questioning the victim about the Appellant's inappropriate touching, the victim said that the Appellant "touched me with his fingers." The victim also immediately said that the Appellant also penetrated her with his penis, inferring that the area the Appellant touched was her genital area. Accordingly, we conclude that the proof was sufficient to establish that the Appellant committed the lesser-included offense of aggravated sexual battery. See State v. Itzol-Deleon, 537 S.W.3d 434, 452 (Tenn. 2017).

On count nine, the Appellant was charged with aggravated sexual battery, and the State elected the "[Appellant's] grabbing the victim's breasts with his hands while standing behind her in the bedroom in the victim's home as witnessed by [the stepgrandmother]." The victim testified that on one occasion, her stepgrandmother walked into the bedroom when the victim and the Appellant "were play fighting one time. And he had me like kind of bent over on the bed with his hands on my breasts." The stepgrandmother's testimony confirmed that she had seen the Appellant standing behind the victim with his hands on her breasts. The evidence is sufficient to sustain the conviction in count nine.

On count ten, aggravated sexual battery, the State elected the "[Appellant's] touching the victim's genitalia with his hand during the nighttime game of hide and seek played outside of the victim's home." The victim testified that on one occasion when her family was outside their residence playing hide and seek in the dark, the Appellant came up to her, slipped his hand inside the waistband of her yoga pants, and touched her vagina. The evidence is sufficient to sustain the conviction in count ten.

On count eleven, solicitation of rape of a child, the State elected the "[Appellant's] asking the victim to put her mouth on his penis while parked at the dead end of Suzanne." The Appellant also asked the victim to perform oral sex on him while they were parked at the dead end of Suzanne Street, but she refused. The evidence is sufficient to sustain the conviction in count eleven.

On count twelve, solicitation of aggravated sexual battery, the State elected the "[Appellant's] asking the victim to touch his penis with her hand while parked at the dead end of Suzanne." The victim said that on one occasion when they were at the dead end of Lawrence Street, the Appellant "asked me if I could jack him off." The victim refused. We note that although the State elected that the offense occurred on Suzanne Street, the victim testified that the offense occurred on Lawrence Street. Our supreme court has explained:

> The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt. . . . The election requirement augment[s] the general unanimity instruction and serves to ensure that the jury understands its obligation to agree unanimously that the defendant committed the same criminal act before it may convict the defendant of a criminal offense.

State v. Qualls, 482 S.W.3d 1, 9-10 (Tenn. 2016) (citations and internal quotation marks omitted). In the instant case, the location of the offense was not necessary for the jury to render a unanimous verdict given that the victim testified about only one incident when the Appellant requested she touch his penis to make him ejaculate. See State v. Bruce Turner, No. W2010-02513-CCA-R3-CD, 2012 WL 12303681, at *13 (Tenn. Crim. App. at Jackson, May 25, 2012). We conclude that the proof was sufficient to sustain the proof in count 12.

On appeal, the Appellant contends that although the victim described the household as "chaotic," no family members ever saw any abuse or questioned the frequent "departure[s] and arrival[s]" of the Appellant and the victim. The Appellant further notes that the victim said Barfield Park closed at dark; however, she testified that an offense occurred in the park while it was dark. The Appellant also contends that if the victim's personal items were inside his clear plastic storage bins, someone in the house should have seen the items prior to his leaving the residence. The record largely belies the Appellant's contentions. We note that the victim explained that although the park closed at dark, it was "near dark" when the Appellant took her to the park. She said that the park had not closed, and the Appellant had time to commit the offense. Moreover, the stepgrandmother witnessed some of the behavior between the Appellant and the victim in the home and was disturbed that the Appellant would not allow her or the victim's brothers to accompany him and the victim to the store. Moreover, regarding the storage bins, the victim testified that the items were so small that they could have been easily overlooked or hidden among

the Appellant's other belongings. The Appellant's complaints essentially challenge the credibility of the witnesses. Determining the credibility of witnesses is within the purview of the jury. See State v. Millsaps, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). Our courts have repeatedly held that the testimony of a rape victim is sufficient standing alone to sustain a conviction. See State v. Elkins, 102 S.W.3d 578, 582-83 (Tenn. 2003); State v. Wyrick, 62 S.W.3d 751, 767 (Tenn. Crim. App. 2001). In the instant case, the jury clearly resolved the issue of credibility in the State's favor. We may not now reconsider the jury's credibility assessment. See State v. Carruthers, 35 S.W.3d 516, 558 (Tenn. 2000). The proof presented at trial amply supports the Appellant's convictions.

## B. Sentencing

On appeal, the Appellant challenges the length of the sentences imposed by the trial court. This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012); see also State v. Pollard, 432 S.W.3d 851, 859 (Tenn. 2013) (applying the standard to consecutive sentencing); State v. Caudle, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In conducting its review, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Appellant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentences. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.[2]

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each

---

[2] We note that the appellate record contains the judgments of conviction for only counts one through eight.

felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

At the sentencing hearing, the trial court, at the request of the State, merged counts four and five. The State argued that enhancement factor (1), namely that the Appellant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, applied to all of the Appellant's convictions. Tenn. Code Ann. § 40-35-114(1). The trial court agreed, noting that the Appellant had a prior conviction of attempted aggravated sexual battery. The State also argued that enhancement factor (7), namely that the offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement, should be applied to the convictions of rape of a child, solicitation of rape of a child, and solicitation of aggravated sexual battery but noted that it could not be applied to the convictions of aggravated sexual battery because it was an element of the offense. Tenn. Code Ann. § 40-35-114(7). The trial court agreed and sentenced the Appellant to thirty years for each rape of a child conviction, ten years for each aggravated sexual battery conviction, ten years for the solicitation of rape of a child conviction, and five years for the solicitation of aggravated sexual battery conviction. The trial court found that consecutive sentencing was appropriate because the Appellant was convicted of two or more offenses involving the sexual abuse of a minor, that the Appellant abused a position of trust in committing the offenses, and that the offenses "went on for sometime until the [step]mother was released

from jail." The trial court ordered all of the sentences to be served consecutively for a total effective sentence of 245 years.

On appeal, the Appellant contends that the trial court improperly applied enhancement factor (7) to the convictions of aggravated sexual battery because it was an element of the offense. Tenn. Code Ann. § 40-35-114(7). The Appellant further contends that the trial court failed to state why enhancement factor (7) applied to the rape of a child convictions.

The record reflects that the trial court agreed with the State that enhancement factor (7) could not be applied to the convictions of aggravated sexual battery because it was an element of the offenses. Our supreme court has held that sexual battery necessarily includes the intent to gratify a desire for pleasure or excitement. See State v. Kissinger, 922 S.W.2d 482, 489 (Tenn. 1996).

We agree with the Appellant that the trial court did not explain its reasoning for applying enhancement factor (7) to the Appellant's convictions of rape of a child, solicitation of rape of child by asking for oral sex, and solicitation of aggravated sexual battery by asking the victim to touch his penis. Nevertheless, the record reflects that after moving into the mobile home to help care for the victim and the other children, the Appellant promised the victim rewards and bought things for her when she complied with his sexual requests. The Appellant arranged to have time alone with the victim. On one occasion when they were interrupted by the victim's brother, the Appellant "kept trying to go" until the victim made him stop. The Appellant also bought the Appellant a provocative Halloween costume that was inappropriate for her age and spoke to the stepgrandmother and stepmother about a girl with whom he was in love and stated that he thought about her frequently. The stepgrandmother and the stepmother thought the Appellant was referring to the victim. Accordingly, the record supports the application of enhancement factor (7) to these convictions.

Regardless, we note that the trial court's imposition of the maximum sentences is justified by the application of enhancement factor (1) alone. See Bise, 380 S.W.3d at 706 ("So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld."). The presentence report reflects that in 2014, the Appellant pled guilty to the aggravated sexual battery of his ex-girlfriend's nine-year-old daughter. The Appellant also had prior convictions of "unlaw[ful] drug paraphernalia uses & activities."

We note that we have reduced the Appellant's conviction in count seven to aggravated sexual battery. We note that the trial court imposed a sentence of ten years for the Appellant's other convictions of aggravated sexual battery, which we likewise deem appropriate for the conviction in count seven. Further, we will not disturb the trial court's imposition of consecutive sentencing.

## C. Right to Fair Trial

Finally, the Appellant contends that his right to a fair trial was violated when he was escorted into the courtroom through a security door by a uniformed officer in view of the jury pool. At the motion for new trial hearing, the Appellant testified that he wore "street clothes" for trial. The Appellant testified that on the morning of trial, he was brought into the full courtroom at 9:00 a.m. The Appellant said that he was wearing street clothes and that he was escorted into the courtroom through the secure side door by a uniformed deputy sheriff who had his hand on the Appellant's shoulder. The Appellant's complaint seemed to be the location of the door.

Defense counsel argued that "we may have inadvertently lifted the vale [sic] of innocence right at the start of the trial" by revealing that the Appellant was in custody and "potential[ly] . . . poison[ed] the mind of the jury." The State said that it did not recall the event and that the Appellant must not have lodged a contemporaneous objection.[3] The State said:

> I believe the proof that has come forth at this particular hearing is that he walked through a – we call it a secure door. But, you know, it's not like – for the record, it's just a white, metal door. It looks like a metal door. It looks like a regular door. It's painted white like the rest of the room. And it's not like gray iron with little bar slats on anything.
>
> He came in through that door with the sheriff's deputy's hand on his shoulder. Unshackled, wearing normal clothes. He was not in an inmate's jumpsuit. And like it's not, I would say such a spectacle might humanize the [Appellant] for the jury with a member of law enforcement putting his hand on his shoulder.

---

[3] The record does not reflect any contemporaneous objection to the way the Appellant was brought into the courtroom.

- 21 -

The trial court stated that the Appellant's trial may have been the first one held in the new building. The trial court noted:

> The elevators bringing someone up from the holding cells in the basement are inside the secure door that is referenced. But there's nothing on the door or in the courtroom that would indicate that there are cells in there. That there [is] any reason that he would be in custody as a reason that he would be brought through that door.

Accordingly, the trial court found that the jurors had no reason to know that the Appellant was coming from a holding area. The trial court further stated that "we had deputies all over the courtroom and all over the hallways and in the entrance with regard to security of the building. And that's not unusual to have a deputy for security." Therefore, the trial court found no prejudice.

This court addressed a similar issue in State v. Marlon D. Beauregard, No. W1999-01496-CCA-R3-CD, 2000 WL 705978 (Tenn. Crim. App. at Jackson, May 26, 2000). In Beauregard, the defendant contended "that he was not permitted to use the door available to the general public, but instead was forced to enter the courtroom from a holding cell adjacent to the courtroom and was escorted to the defense table by two sheriff's deputies." Id. at *8. The defendant argued that he was thereby deprived of a fair trial because the jurors knew he was incarcerated and the jurors would have speculated on what crime he previously committed. Id. This court acknowledged that "'a defendant should not be required to wear prison clothing or be in handcuffs during trial in a courtroom, except insofar as the trial court, in its sound discretion may find it necessary to prevent escapes, violence or misconduct which would impede the trial.'" Id. (quoting State v. Baker, 751 S.W.2d 154, 164 (Tenn. Crim. App. 1987)). This court concluded, however, that although the defendant was escorted into the courtroom by two guards, the defendant was not restrained in any way. Id. This court explained that

> [w]hile shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. . . . Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards.

Id. at \*8-9 (quoting <u>Holbrook v. Flynn</u>, 475 U.S. 560, 569 (1986)).  Further, this court stated that the record was not clear whether the defendant's entrance into the courtroom had any effect on the jury.  <u>Id.</u> at \*9.

As in <u>Beauregard</u>, the Appellant, who was in "street clothes" and was not in shackles, was escorted into the courtroom by a uniformed deputy sheriff.  Although the Appellant claimed the side door through which he was escorted was a "secured door," the trial court found that the door was "a plain white, metal door" which bore no markings "that would indicate to the jurors that it leads to an inmate holding area."  The trial court found that the Appellant suffered no prejudice.  <u>See</u> <u>Beauregard</u>, No. W1999-01496-CCA-R3-CD, 2000 WL 705978, at \*8-9; <u>see also</u> <u>State v. Charles Wade McGaha</u>, No. E2006-01984-CCA-R3-CD, 2008 WL 148943, at \*9 (Tenn. Crim. App. at Knoxville, Jan. 16, 2008); <u>State v. Carlos Demetrius Harris</u>, No. E2000-00718-CCA-R3-CD, 2001 WL 9927, at \*3-4 (Tenn. Crim. App. at Knoxville, Jan. 4, 2001).

> "Generally, the trial court, which has presided over the proceedings, is in the best position to make determinations regarding how to achieve [the] primary purpose [of ensuring a fair trial], and absent some abuse of the trial court's discretion in marshalling the trial, an appellate court should not redetermine in retrospect and on a cold record how the case should have been better tried."

<u>Beauregard</u>, No. W1999-01496-CCA-R3-CD, 2000 WL 705978, at \*9 (quoting <u>State v. Franklin</u>, 714 S.W.2d 252, 258 (Tenn. 1986)).  We conclude that the trial court did not err.

## III.  Conclusion

In sum, we conclude that the State adduced insufficient evidence to sustain the Appellant's conviction of rape of a child in count 7; however, the evidence is sufficient to sustain a conviction of the lesser-included offense of aggravated sexual battery with an accompanying sentence of ten years.  The trial court's judgments are affirmed in all other respects.

_____

NORMA MCGEE OGLE, JUDGE